**THE STATE OF NEW HAMPSHIRE**

**SUPREME COURT**

**In Case No. 2024-0046, <u>BDP Holdings, LLC v. The Eideard Group, LLC & a.</u>, the court on August 1, 2025, issued the following order:**

The court has reviewed the written arguments and the record submitted on appeal, has considered the oral arguments of the parties, and has determined to resolve this case by way of this order. <u>See</u> <u>Sup. Ct. R.</u> 20(3). The defendants, Ronald L. Roberts (now deceased)[1], The Eideard Group, LLC, and Roberts Asset Mgt., LLC, a/k/a Roberts Asset Management, LLC, appeal a jury verdict in the Superior Court (<u>Delker</u>, J.) awarding the plaintiff, BDP Holdings, LLC (BDP), nearly $28 million in damages based upon its claims against the defendants for breach of fiduciary duty, negligence, breach of contract, and negligent misrepresentation. We affirm.

The jury could have found the following facts. In 2004, the six adult children of Robert and Cynthia Hoehl formed BDP as an investment entity.[2] They were advised by Roberts, who worked as a family office manager, and Roberts' investment advisory firm, The Eideard Group. Roberts also served as BDP's managing member. In that role, he had full discretionary authority to make decisions on BDP's behalf. The Eideard Group agreed to create an asset allocation strategy for BDP that would be consistent with the Hoehls' risk tolerance and investment objectives. According to the Hoehls, they intended that BDP would pursue a conservative, low-risk investment strategy.

In 2012, the defendants, on BDP's behalf, began making private equity investments in a company named G-Form. Roberts also co-invested his own funds in G-Form and joined its board of directors, without informing all of the Hoehls of either his personal investment or his position on G-Form's board. The following year, the defendants also caused BDP to extend a substantial line of credit, with favorable terms, to G-Form. Roberts eventually became the chair of G-Form's board and received what he characterized as a "very minority position" of 750,000 shares in the company, which he did not disclose to all of the other members of BDP.

---

[1] Michael Dean Kenney, as the personal representative of Roberts' estate, has been substituted for Roberts as a party in this appeal.

[2] The Hoehl siblings collectively held a 99.75% interest in BDP, and Roberts held a 0.25% interest.

Notwithstanding BDP's funding, G-Form struggled financially over the next several years. The defendants continued, however, to invest BDP's assets in G-Form; by 2017, BDP had invested more than $8 million in the company. By early 2018, BDP's investment had grown to approximately $12 million, and there was $21 million in outstanding debt on its line of credit to G-Form. Roberts acknowledged that, at one point, 40% of BDP's assets were invested in G-Form. When G-Form struggled to make loan payments, Roberts agreed to reduce the interest rate on BDP's loans and reduce G-Form's repayment obligation. Even after Roberts made these accommodations for G-Form, in 2017 and 2018, G-Form made no interest payments to BDP and defaulted on the loans.

During this time, The Eideard Group distributed quarterly investment performance reports to the Hoehls. With the exception of the second and third quarters of 2016, the reports did not specify the extent of BDP's involvement with G-Form. Rather, the reports listed general categories of "Alternative Assets," such as "Promissory Notes" and "Venture Capital," not the names of specific investments.

In May 2018, counsel for one of the Hoehl siblings (John Hoehl) wrote a letter to Roberts inquiring about BDP's performance and requesting an evaluation of John Hoehl's holdings. The following month, Roberts provided his written responses to the inquiries. Although he briefly mentioned the "revolving line of credit secured by all the assets of G-Form" and that G-Form had not paid interest payments since the beginning of 2017, his responses failed to reveal the extent of G-Form's financial losses.

At a meeting in February 2019, Roberts discussed G-Form in greater detail with the Hoehls. He disclosed his concerns regarding G-Form's finances and his plan to convert the approximately $30 million in G-Form debt held by BDP into equity shares in order to raise additional capital for G-Form. In addition, Roberts proposed that BDP issue an additional investment of approximately $3 million in G-Form. The Hoehls agreed to defer to Roberts' judgment as to whether they should invest additional funds in G-Form.

The Hoehls thereafter learned of numerous conflicts of interest relating to the defendants and, in particular, Roberts' roles in BDP and G-Form. BDP terminated its relationship with The Eideard Group in 2020. In May 2021, BDP filed a complaint against the defendants and other employees of The Eideard Group alleging, inter alia, breach of fiduciary duty, negligence, breach of contract, and negligent misrepresentation. The defendants subsequently moved for partial summary judgment, arguing that any damages claimed by BDP arising from its investments made prior to May 2018 are time-barred by the applicable statute of limitations. The trial court reserved ruling until trial.

At trial, BDP presented expert testimony that it "suffered damages of . . . between 55 and 80 million dollars" arising from the unsuccessful investment in G-Form. The jury also heard evidence that the defendants failed to comply with industry standards relating to investment advisors and disclosure of conflicts of interest. After BDP rested, the defendants moved for a directed verdict, arguing that BDP had failed to prove that their conduct was the proximate cause of BDP's harm. The court denied the motion. The court also denied the defendants' motion for partial summary judgment, concluding that, based upon the evidence presented, the Hoehls did not have actual knowledge of, and could not reasonably have discovered, the harm caused by the defendants' conduct until June 2018 at the earliest and, therefore, that BDP's claims were not time-barred by the statute of limitations.

The jury subsequently found the defendants liable on theories of breach of fiduciary duty, negligence, breach of contract, and negligent misrepresentation. It concluded that the defendants' conduct was the legal cause of BDP's injuries and awarded BDP approximately $27.6 million in damages. The defendants subsequently moved to set aside the jury's verdict, which the court denied. The defendants also unsuccessfully moved for reconsideration of the trial court's ruling regarding the statute of limitations. This appeal followed.

On appeal, the defendants first argue that the trial court erred in determining that the discovery rule applies and that BDP's claims were not time-barred. BDP counters that the trial court sustainably exercised its discretion in concluding that BDP was not on inquiry notice of the defendants' breach until, "at the earliest, June 6, 2018." We agree with BDP.

RSA 508:4, I, codifies the common law discovery rule. Balzotti Global Grp., LLC v. Shepherds Hill Proponents, LLC, 173 N.H. 314, 320 (2020). It provides that all personal actions, except those for slander and libel, must be brought within three years of the act or omission complained of "except that when the injury and its causal relationship to the act or omission were not discovered and could not reasonably have been discovered at the time of the act or omission," then the action must be commenced within three years of "the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its causal relationship to the act or omission complained of." RSA 508:4, I (2010). Once a defendant has established that the statute of limitations would bar an action, the plaintiff has the burden of raising and proving that the discovery rule is applicable to an action that would otherwise be barred by the statute of limitations. Balzotti, 173 N.H. at 320.

Pursuant to RSA 508:4, I, the three-year limitations period does not begin to run until two prongs are satisfied: first, a plaintiff must know or reasonably should have known that it has been injured; and second, a plaintiff must know or reasonably should have known that its injury was proximately

3

caused by the defendants' conduct.  Id.; see also Beane v. Dana S. Beane & Co., 160 N.H. 708, 713 (2010).  To obtain the benefit of the discovery rule and overcome the defendants' statute of limitations defense, the plaintiff must prove that at least one prong was not yet satisfied within three years of the plaintiff's commencement of the action.  See Beane, 160 N.H. at 713.  Thus, the discovery rule does not apply unless the plaintiff proves that it did not discover, and should not reasonably have discovered, either the alleged injury or its causal connection to the defendants' alleged wrongful acts or omissions.  See id.

The rule is not intended to toll the statute of limitations until the full extent of the plaintiff's injury has manifested itself.  Balzotti, 173 N.H. at 321.  Rather, if the evidence sufficiently establishes that a plaintiff should have reasonably discerned that it suffered some harm caused by the defendants' conduct, then the discovery rule is inapplicable.  Id.  "Further, a plaintiff need not be certain of this causal connection; the possibility that it existed will suffice to obviate the protections of the discovery rule."  Beane, 160 N.H. at 713.

"Whether the plaintiff exercised reasonable diligence in discovering the causal connection between the injury and the defendant's alleged act or omission is a question of fact."  Kelleher v. Marvin Lumber & Cedar Co., 152 N.H. 813, 825 (2005).  Moreover, whether to apply the discovery rule is an issue that is equitable in nature.  Balzotti, 173 N.H. at 321; Keshishian v. CMC Radiologists, 142 N.H. 168, 179 (1997).  We review a trial court's decision to grant equitable relief for an unsustainable exercise of discretion.  Benoit v. Cerasaro, 169 N.H. 10, 19 (2016).  In doing so, we determine whether the record establishes an objective basis sufficient to sustain the discretionary judgment made.  Id. at 20.  The parties asserting that an equitable ruling is unsustainable must demonstrate that the ruling was unreasonable or untenable to the prejudice of their case.  See id.

Here, the trial court concluded that "the owners of BDP, the Hoehl siblings, could not reasonably . . . have discovered the harm" caused by the defendants' conduct until June 2018 when Roberts responded to John Hoehl's inquiries.  It determined that this was "the earliest possible moment that would trigger the inquiry notice" due, in part, to the "trust [BDP] vested in Eideard and . . . Mr. Roberts" until that point.  Accordingly, the trial court concluded that the discovery rule applied to BDP's claims and that the statute of limitations did not start to run until June 2018, which fell within three years prior to the filing of the May 2021 complaint.

The defendants claim that BDP should have inquired as to the details of the G-Form investment earlier and that the Hoehl siblings were on inquiry notice "as early as 2007 that a significant portion of BDP's funds were being invested in alternative investments, and as early as 2012-2013 concerning the

4

G-Form investment in particular." They also argue that the trial court erred by considering the level of trust BDP placed in the defendants when assessing whether BDP was under a duty to inquire.

We are not persuaded. At trial, there was testimony that the Hoehls entrusted the defendants to make investment decisions on BDP's behalf, in part due to the fact that Roberts had worked with their family in the past. Roberts testified that, in his role as managing member of BDP and as an investment advisor, he worked in BDP's best interests as a fiduciary, and the Hoehls agreed to grant him discretion in making investment decisions. The evidence presented at trial, however, supports the conclusion that the Hoehls neither understood nor should have understood that Roberts was pursuing an investment strategy that was inconsistent with their stated objectives.

In May 2018, counsel for John Hoehl sent the following written questions to Roberts: "What are the terms of the G-Form, Inc. [line of credit]? What is the collateral? Is the note receivable shown on the financial statements at face value? Are interest payments made according to the loan agreement?" In June 2018, Roberts replied:

> G-Form note is a revolving line of credit secured by all the assets of G-Form and its wholly-owned manufacturing company . . . . Interest payments were current through December 2016 but have not be[en] paid [since] and have been fully reserved for. . . . G-Form is in the process of raising additional capital and we have been asked and are reviewing restructuring the loan in order to do so.

As BDP notes in its brief, the defendants have not pointed to any information or facts known to BDP prior to these June 2018 disclosures that would have put BDP on inquiry notice that its G-Form investment was in jeopardy or that would have led the Hoehls to question whether the defendants had breached their fiduciary duties.

Contrary to the defendants' claim that BDP was on inquiry notice regarding G-Form since at least 2012-2013, the quarterly reports and the annual audited financial statements distributed by the defendants did not clearly indicate the extent of BDP's investment in G-Form, nor did they reveal G-Form's financial difficulties. That the Hoehls accepted the reports and statements at face value and deferred to the defendants' financial expertise does not establish that they failed to make reasonable efforts to discern the harm caused by the defendants' conduct.

The record also supports the conclusion that the Hoehls did not have actual knowledge of the defendants' misconduct prior to June 2018. The Hoehls did not know the operative facts supporting BDP's claims until February 2019, when BDP learned of the extent of its G-Form investment and

5

Roberts' debt-to-equity conversion plan. Indeed, the Hoehls testified that they were not aware of the depth of their investment and how dire the situation was. Some members of the Hoehl family also testified that they were not aware until 2019 that Roberts sat on G-Form's board or that he received stock in G-Form for his role on the board. One of the Hoehls testified that she did not "hear anything about G-Form from 2012 to 2019." She stated that, even after the meeting, she "didn't catch that [Roberts] was going to take the number one position of 26 million dollars plus 4.6 [million dollars of] unpaid interest and put it behind all the other stocks so that, you know, 10 years down the road, we might get our money back." Roberts himself testified that he did not inform the Hoehls of the full extent of BDP's investments in G-Form, or the losses sustained therefrom, until 2019.

As the foregoing demonstrates, the record contains ample evidence that the earliest point at which BDP either knew or should reasonably have discerned that it had suffered some harm caused by the defendants' conduct was in June 2018. Accordingly, we conclude that the defendants have failed to meet their burden of establishing that the trial court's application of the discovery rule was unreasonable or untenable to the prejudice of their case. See Balzotti, 173 N.H. at 321.

The defendants next argue that the trial court erred by denying their motions for a directed verdict and to set aside the jury verdict. They contend that BDP failed to demonstrate that its financial harm would not have occurred but for the defendants' conduct or that the defendants' conduct was a substantial factor in BDP's injuries. Specifically, they maintain that BDP failed to establish that the Hoehls would have acted differently had they known more about the G-Form investment and contend that the Hoehls' conduct, rather than other extraneous factors, was a "substantial factor" in BDP's harm. They also argue that COVID-19 was a primary cause of the injury to BDP. We disagree.

Because the defendants' arguments relate to the sufficiency of the evidence, they present questions of law, and our standard of review is de novo. See 101 Ocean Blvd., LLC v. Foy Ins. Grp., Inc., 174 N.H. 130, 145 (2021). A party is entitled to a directed verdict only when the sole reasonable inference that may be drawn from the evidence, which must be viewed in the light most favorable to the non-moving party, is so overwhelmingly in favor of the moving party that no contrary verdict could stand. See id. The court cannot weigh the evidence or inquire into the credibility of the witnesses, and if the evidence adduced at trial is conflicting, or if several reasonable inferences may be drawn, the motion should be denied. Id.

Proximate cause is generally for the trier of fact to resolve. Carignan v. N.H. Int'l Speedway, 151 N.H. 409, 414 (2004). The trial court correctly determined that "[t]he jury was presented [with] a number of theories on which

6

it could (and did) find the defendants liable." Viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to BDP, we conclude that the evidence was sufficient for a rational trier of fact to have found that the defendants' conduct was both the cause-in-fact and the legal cause of BDP's injuries. See id. (discussing cause-in-fact and legal cause).

BDP's expert opined that, consistent with the "general principles of prudent investment management for an entity like BDP," "not a dollar of G-Form should have been purchased." He testified that "from an economist's point of view . . . BDP suffered damages of . . . between 55 million and 80 million dollars," which represents the difference between BDP's portfolio after investing in G-Form and "what the investment results would have been" had the Hoehls invested the same amount of money "in a diversified stock portfolio." According to the expert, "no one else was investing in G-Form in those amounts on those terms but for the client that [was] controlled by Mr. Roberts, who had [his own] . . . cash investment."

In addition, another expert for BDP opined that the defendants' conduct failed to comply with multiple industry standards relating to investment advisors. First, he testified that the defendants failed to meet the relevant standard for disclosure of conflicts of interest. This conclusion was based upon the defendants' admission that they made inadequate or "not full and fair" conflict of interest disclosures to the Hoehls. As previously noted, the jury also heard evidence that some members of the Hoehl family were unaware of Roberts' co-investment in G-Form or his position on G-Form's board.

Second, the expert concluded that the defendants failed to conduct reasonable inquiries into BDP's investment objectives and risk tolerance and whether certain investments, including the G-Form investment, were in BDP's best interest. The expert's conclusion was based upon Roberts' acknowledgement "that he didn't talk to the Hoehl children about their investment goals, objectives, and risk tolerances." Regarding the debt-to-equity conversion in 2019, for example, Roberts acknowledged that, rather than converting its debt to equity in G-Form, BDP could have foreclosed on the debt and liquidated G-Form's assets. By his own admission at trial, Roberts, however, did not conduct a formal liquidation analysis to determine whether foreclosing on BDP's loan and forcing G-Form to liquidate its assets would have better protected BDP's interests. As the trial court noted, the jury could have found that Roberts, who was then the chair of G-Form's board and a G-Form shareholder, "subordinated BDP's secured position in G-Form to [his] own self-interest."

From the extensive evidence presented at trial, the jury could have reasonably determined that BDP's harm would not have occurred but for the defendants' conduct and that the defendants' conduct was a substantial factor in bringing about the harm suffered. See Carignan, 151 N.H. at 414. Contrary

7

to the defendants' argument, there is evidence in the record that, had the Hoehls been aware of the information regarding G-Form's poor performance prior to 2019, they would have acted differently, including by withdrawing their investments with the defendants. Moreover, the record fails to support the defendants' assertion that the COVID-19 pandemic was the primary cause of BDP's losses, given that G-Form sustained millions of dollars in losses on a yearly basis prior to 2020. Accordingly, we conclude that the trial court properly denied the defendants' motions for a directed verdict and to set aside the verdict. See 101 Ocean Blvd., 174 N.H. at 145.

Finally, the defendants advance additional arguments challenging the trial court's jury instructions and evidentiary rulings. As the appealing parties, the defendants have the burden of demonstrating reversible error. Gallo v. Traina, 166 N.H. 737, 740 (2014). Based upon our review of the defendants' remaining arguments, the relevant law, and the record submitted on appeal, we conclude that the defendants have not demonstrated reversible error. See id.; Sup. Ct. R. 25(8).

Affirmed.

COUNTWAY and DONOVAN, JJ., concurred; NADEAU, J., retired superior court chief justice, and ABRAMSON, J., retired superior court justice, both specially assigned under RSA 490:3, II, concurred.

**Timothy A. Gudas,**
**Clerk**